# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| E2E PROCESSING, INC.,<br><br>    Plaintiff,<br><br> v.<br><br>CABELA'S INCORPORATED,<br><br>    Defendant. | Case No. 2:14-cv-00036-JRG-RSP<br><br>(CONSOLIDATED)<br><br>DEMAND FOR JURY TRIAL |
| E2E PROCESSING, INC.,<br><br>    Plaintiff,<br> v.<br><br>CROCS INC., ET AL.,<br><br>    Defendants. | Case No. 2:14-cv-00037-JRG-RSP<br><br>DEMAND FOR JURY TRIAL |
| E2E PROCESSING, INC.,<br><br>    Plaintiff,<br> v.<br><br>HALLMARK CARDS INCORPORATED,<br>ET AL.,<br><br>    Defendants. | Case No. 2:14-cv-00038-JRG-RSP<br><br>DEMAND FOR JURY TRIAL |
| E2E PROCESSING, INC.,<br><br>    Plaintiff,<br> v.<br><br>NORDSTROM, INC.,<br><br>    Defendant. | Case No. 2:14-cv-00039-JRG-RSP<br><br>DEMAND FOR JURY TRIAL |

**DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF**

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................................1

II.    DISCUSSION ..........................................................................................................1

    A.     "selector component" / "adapter component" / "integration component"...............1

        1.     The Component Terms Are Subject To Construction Under § 112 ¶ 6...................................................................................................................3

        2.     The Word "Component" Does Not Recite Sufficiently Definite Structure To Perform The Claimed Functions............................................6

        3.     The Written Description of the '222 Patent Provides No Sample Flowcharts, Description, Code, or Schemas That Would Identify a Specific Structure for the Claimed "Components."...................................7

        4.     Plaintiff's Proposed Constructions Are Purely Functional.......................12

    B.     Preamble ("Exchanging information in a manufacturing environment between a manufacturer and a customer")........................................................................14

        1.     The Specification Dictates a Finding That the Preamble Is a Limitation..................................................................................................15

        2.     The Specification and Dictionary Definitions Support Defendants' Construction..............................................................................................21

    C.     "invoking an internet server application program interface component to pass the extensible markup language document to an integration component" ...............23

    D.     "internet server application program interface component".................................25

III.   CONCLUSION.......................................................................................................28

CERTIFICATE OF SERVICE .........................................................................................31

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aoyama*,
  656 F.3d 1293 (Fed. Cir. 2011)..................................................................................8

*Aristocrat Techs. Aus. Pty Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008)..................................................................................8

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006).............................................................................15, 27

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003).................................................................................27

*CCS Fitness, Inc. v. Brunswick Corp.*,
  288 F.3d 1359 (Fed. Cir. 2002)...............................................................................4, 5

*Cent. Admixture Pharm. Servs., Inc. v. Advanced Cardiac Solutions, P.C.*,
  482 F.3d 1347 (Fed. Cir. 2007).................................................................................25

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
  868 F.2d 1251 (Fed. Cir. 1989).....................................................................18, 19, 20

*Finisar Corp. v. DirecTV Grp., Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008)..................................................................................8

*Gen. Elec. Co. v. Nintendo Co., Ltd.*,
  179 F.3d 1350 (Fed. Cir. 1999).................................................................................17

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
  355 F.3d 1327 (Fed. Cir. 2004)..................................................................................2

*Griffin v. Bertina*,
  285 F.3d 1029 (Fed. Cir. 2002).................................................................................20

*Jansen v. Rexall Sundown, Inc.*,
  342 F.3d 1329 (Fed. Cir. 2003).................................................................................20

*Kwik Prods., Inc. v. Nat'l Express, Inc.*,
  179 Fed. Appx. 34 (Fed. Cir. 2006)............................................................................5

*Micash Inc. v. NetSpend Corp.*,
  Case No. 2:12-CV-248-JRG, 2013 WL 3803470 (E.D. Tex. July 17, 2013)...................24, 25

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)......................................................................................8

*Noah Systems Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012)........................................................................9, 10, 12

*Omega Engr., Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)....................................................................................12

*Personalized Media Comms., LLC v. Int'l Trade Com'n*,
    161 F.3d 696 (Fed. Cir. 1998)........................................................................................2

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999)....................................................................................16

*PODS, Inc. v. Porta Stor, Inc.*,
    484 F.3d 1359 (Fed. Cir. 2007)....................................................................................24

*Poly-America, L.P. v. GSE Lining Tech., Inc.*,
    383 F.3d 1303 (Fed. Cir. 2004)......................................................................15, 17, 20

*Powell v. Home Depot*,
    663 F.3d 1221 (Fed. Cir. 2011)....................................................................................26

*Robert Bosch, LLC v. Snap-On Inc.*,
    769 F.3d 1094 (Fed. Cir. 2014)..............................................................................*passim*

*Vizio, Inc. v. ITC*,
    605 F.3d 1330 (Fed. Cir. 2010)......................................................................15, 17, 27

*Warner–Lambert Co. v. Apotex Corp.*,
    316 F.3d 1348 (Fed. Cir. 2003)....................................................................................24

**Statutes**

35 U.S.C. § 112, ¶ 6 ..............................................................................................*passim*

**Other Authorities**

Manual of Patent Examining Procedure § 608.01(p)....................................................12

## I.      INTRODUCTION

Pursuant to the Court's Docket Control Order[1], Defendants hereby respond to the Opening Claim Construction Brief ("Opening Brief") of Plaintiff E2E Processing, Inc. ("E2E" or "Plaintiff") and submit their Responsive Claim Construction Brief for construction of terms or phrases in asserted claim 7 of U.S. Patent No. 6,981,222 ("the '222 patent").

The '222 patent describes implementing an end-to-end transaction processing system in a "made-to-order" manufacturing environment. *See, e.g., id.* at 1:15-25. This method is accomplished through the use of several components—which communicate by passing along an extensible markup language ("XML") document—that allow a manufacturer's server to talk to a back-office database and return information to a customer. *See id.* at 10:6-11:24.

Defendants' constructions provide clarity, when possible, to the ambiguous and functional terms contained within asserted claim 7. In contrast, Plaintiff offers constructions that generally rely on the "plain and ordinary meaning" of the claim terms and ignore the lack of specific structure within the specification of the '222 patent, while simultaneously seeking to expand the scope of the alleged invention.

As the Court is familiar with general claim construction standards and related precedents, Defendants will refrain from reciting them here. Instead, Defendants will focus on the legal precedents specific to the parties' claim construction positions.

## II.      DISCUSSION

### A.      "selector component" / "adapter component" / "integration component"

| Term | Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| "selector component" | Not governed by 35 U.S.C. § 112, ¶ 6. Plain meaning, or: | *Indefinite under Section 112 ¶ 6* |

---

[1] *See* Case No. 2:14-cv-00036, Dkt No. 42.

| | | Function: selecting an adapter component<br><br>Structure/Algorithm: None provided. |
|---|---|---|
| | A component that reads the header information in the XML document and sends the XML document to the adapter component | |
| "adapter component" | Not governed by 35 U.S.C. § 112, ¶ 6. Plain meaning, or:<br><br>A component that processes an XML message for the remote back-office database server | *Indefinite under Section 112 ¶ 6*<br><br>Function: adapting for a particular remote back-office database server.<br><br>Structure/Algorithm: None provided. |
| "integration component" | Not governed by 35 U.S.C. § 112, ¶ 6. Plain meaning, or:<br><br>A component that processes incoming information, and accesses the appropriate database to retrieve the requested information or perform the requested manipulation | *Indefinite under Section 112 ¶ 6*<br><br>Function: integrating to retrieve the requested information<br><br>Structure/Algorithm: None provided. |

Under 35 U.S.C. § 112 ¶ 6, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof." *Personalized Media Comms., LLC v. Int'l Trade Com'n*, 161 F.3d 696, 703 (Fed. Cir. 1998). In exchange for allowing this type of claiming, the scope of a claim containing such a means-plus-function limitation is limited to "the corresponding structure, material, or acts described in the specification and equivalents thereof." *Id*. Construing a claim under § 112 ¶ 6 is thus a two-step process. The first step is identifying the particular function recited. *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1333 (Fed. Cir. 2004) (citation omitted). The second step is identifying, in the specification, the structure that corresponds to that function. *Id*. at 1334.

As set forth below, the terms "selector component," "adapter component," and "integration component" (hereinafter the "component terms") are (1) subject to construction under §112 ¶ 6

and (2) indefinite for failure to provide any definite structure as required by the statute. Plaintiff's opening brief attempts to counter both of these conclusions but never addresses the actual issues with the component terms. Instead, Plaintiff's evidence and argument concern only whether a person of ordinary skill in the art ("POSITA") could create an XML document or program using the XML language. But this argument misses the point—Defendants do not contend that the "extensible markup language document" claim limitation renders claim 7 indefinite. Rather, claim 7 is indefinite because each of the claimed "components" identify a function without structure.

**_Notably, Plaintiff does not contend that these limitations have specific structure known to a POSITA outside of the four corners of the patent_**. The inventors coined the component terms to describe key steps of the claimed method, but the '222 patent provides insufficient guidance on how to construct what is claimed. In this case, a POSITA has only the claim language itself to work from, and even an expert programmer would not know the definite structure intended to perform the functions of the "selector component," "adapter component," and "integration component."[2] Therefore, the Court should hold that the asserted claim is invalid because the component terms do not satisfy § 112 ¶ 6.

### 1.     The Component Terms Are Subject To Construction Under § 112 ¶ 6

Although "a claim term that does not use 'means' will trigger the rebuttable presumption that § 112, ¶ 6 does not apply . . . a [party] can rebut this presumption if it demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites a 'function without reciting

---

[2] Plaintiff's assertion that the alleged bias of Defendants' expert, Mr. Ed Tittel, is "exacerbated" because he would not have been a POSITA as of 1998, misrepresents the record to this Court. Plaintiff admitted to Defendants that the priority date for the asserted claim is June 21, 2000, as the 1998 priority document has no mention of XML or the claimed components. *See* Ex. A, Pltf 2nd Am. Responses to Defs' Interrogatories, at 9 (Feb. 4, 2015). By this later priority date, Mr. Tittel was a POSITA under his definition.

sufficient structure for performing that function.'" *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002) (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). "To help determine whether a claim term recites sufficient structure, [the Court shall] examine whether it has an understood meaning in the art." *Id.,* citing *Watts*, 232 F.3d at 880-81.

As an initial matter, in the asserted claim, an XML document is passed to a selector component and then passed to an adapter component. '222 patent at 20:15-20. The claim does not explain exactly how this exchange occurs, but the specification explains, for example, that the selector component must be the one "selecting" the particular adapter component to which the XML document will be passed. *Id.* at 10:28-30 ("**Selector component** 208 reads the header node information in the XML document and **sends the XML document to adapter components** 210.") (emphasis added). Accordingly, the claimed function for selector component must include this additional functional aspect of the claimed method, even though this aspect is implicit and not set forth in the claim verbatim.

Defendants' proposed functions of the adapter and integration components are similarly included in the claim. The claim requires that the request for information "transmit[ed] … to a remote back-office database server" be a "processed request"—thus the "adapting" of the adapter component must also involve a specific form of "processing" for that back-office server. Finally, the resulting step of the "integrating" of the integration component is "receiving information from the back-office database server." *See also* '222 patent at 10:34-36 ("**Adapter components** 210 enable preprocessing of the XML message, invoke a proxy component and define specific remote procedure call and parameter list. . . . **The SQL statement is then passed to back-office server computer 140** . . . ."); 11:18-21 ("Once the information is retrieved or the manipulation effected, **integration component 306 creates a return XML document with the appropriate information**.")

-4-

(emphasis added). Thus, Defendants have properly identified the functions of the component terms as required in construing § 112 ¶ 6 terms. Notably, Plaintiff's own proposed constructions include similar functions for these claim terms.

With the functions properly identified, the next step in the claim construction process is to attempt to identify the structure necessary to perform the claimed functions. Although the words "adapter" and "component" may have individual meanings in the art, those meanings are, at best, generic and not the type of "well understood meaning" that would confer the term "adapter component" with sufficient structure. *See CCS Fitness*, 288 F.3d at 1359; *Kwik Prods., Inc. v. Nat'l Express, Inc.*, 179 Fed. Appx. 34, 39 (Fed. Cir. 2006) (noting that a claim without a "well understood meaning in the art" was subject to means-plus-function analysis). As Defendants' expert, Mr. Ed Tittel, explains:

> Both of these terms are generic in the sense that each one identifies a ***broad class of function*** or role, but does not impart clear and definite structure for that function or role, nor sufficient detail to inform a person of ordinary skill in the art how or what to build simply from the terminology alone.

Dkt. No. 70-1 at ¶ 36 (emphasis added).

Thus, while a POSITA may understand a generic adapter to allow communications between otherwise incompatible modules and a component to be a module of software, a POSITA would not understand these terms—either alone or in combination—to confer any specific structure (such as a particular algorithm for a software component) such that a POSITA could practice the asserted claim of the '222 patent. *See id.* at ¶¶ 35-36. Plaintiff's contrary arguments, which are all based on its expert's irrelevant discussion of whether a POSITA can create XML documents, do not rebut any of Mr. Tittel's testimony.

The same is true for the generically recited "selector component" and "integration component." These claim terms are like those in *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d

1094 (Fed. Cir. 2014), where the court noted that the terms "program recognition device" and "program loading device" each "do nothing more than identify functions for the 'device' to perform," and thus rebut the presumption such that they were appropriately construed under § 112 ¶ 6. *Id.* at 1099. Moreover, Plaintiff here offers no evidence of these "component" terms having any definite, understood structures in the art, because they do not have any such structures. The inventors of the '222 patent simply coined these terms to refer to specific functions they allegedly created. *See* Dkt. No. 70-1 at ¶¶ 70-83.

While the component terms in this case do not include the word "means," they do identify functions without sufficiently defining their structures, thereby rebutting the presumption that the terms are not means-plus-function terms. Because these components also do not have any understood meanings in the art, they are subject to § 112 ¶ 6. *See* Dkt. No. 70-1 at ¶¶ 70-83.

### 2. The Word "Component" Does Not Recite Sufficiently Definite Structure To Perform The Claimed Functions.

The word "component," standing alone, does not recite structure sufficiently definite to allow a POSITA to perform the claimed functions. As explained by Mr. Tittel:

> The functional terms used in the '222 Patent – namely, adapter and component, with numerous modifiers for each one (application adapter, order status adapter, ship status adapter, and invoice status adapter, adapter component, selector component, special component (3:42), "components on remote systems" (6:57), and so forth) – convey some general notion of what kind of function they are supposed to perform, but never do they (or the patent language surrounding them) manage to explain how a person of ordinary skill in the art is to implement such functions, what kinds of inputs such functions are to operate upon, and what outputs such functions are intended to produce.

Dkt. No. 70-1 at ¶ 59.

Here, a POSITA has only the words "[selector / adapter / integration] component" to work from, as the inventors of the '222 patent provided no sample code, flowcharts, or XML schemas that would sufficiently inform a POSITA on how to program the component to handle its function

for a generic XML request. This is evident from one of the provisional applications (not incorporated by reference) where the inventors acknowledged the need to provide such structure—in that instance, they purported to provide example XML schemas to guide a POSITA. But their alleged disclosure was deficient because they disclosed only the phrase "blah blah blah" as a placeholder for the example XML schemas. Dkt. No. 70-1 at ¶ 61; Ex. B, Provisional Application No. 50-225339, Appendix A, Table of Contents, pg. 13.

As Mr. Tittel explains, a bare software "component" is insufficient for a POSITA to implement the claimed functions of the component terms because no algorithm is disclosed, anywhere in the '222 patent, for performing those functions. Dkt. No. 70-1 at ¶¶ 70-83. The component terms therefore do nothing more than convey to a POSITA that the claimed invention includes generic software modules that perform some functions of "selecting," "adapting," and "integrating"—such disclosure is insufficient to meet the requirements of § 112 ¶ 6.

Arguing in opposition, Plaintiff relies heavily on this Court's decision in *Widevine Technologies, Inc. v. Verimatrix, Inc.*, where the Court stated that the term "component" was not governed by § 112 ¶ 6. 2009 WL 3734106, at *16 (E.D. Tex. Nov. 4, 2009). But in that case, "[t]he Court [found] that the claim provide[d] sufficient structure to 'component'" because surrounding claim language, in combination with the specification, tied "component" to specific software elements for performing encryption. *Id.* Here, the surrounding claim language and specification do not provide such contextual support.

3.  **The Written Description of the '222 Patent Provides No Sample Flowcharts, Description, Code, or Schemas That Would Identify a Specific Structure for the Claimed "Components."**

Under the § 112 ¶ 6 test's "second step, structure disclosed in the specification is corresponding structure only if the specification or prosecution history ***clearly links or associates***

that structure to the function recited in the claim." *In re Aoyama*, 656 F.3d 1293, 1297 (Fed. Cir. 2011) (internal quotation omitted) (emphasis added). Failure to disclose structure that performs the claimed function renders the claim invalid for indefiniteness under § 112, ¶ 2. *Aristocrat Techs. Aus. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1331-32 (Fed. Cir. 2008). For software limitations to meet the definiteness requirements of § 112, the specification must disclose an algorithm for performing the claimed function. *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008). The algorithm may be expressed in "any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (citations omitted). But the patent ***must disclose the algorithm***; it cannot merely restate the function recited in the claim. *Id.*

As to the "selector component," the patent does not disclose a generic algorithm for selecting an adapter component. It simply states that the selector component reads the header and sends the XML document to an adapter, which are functions, and not any type of structure for informing POSITA ***how*** the claimed "selecting" is performed. *See Robert Bosch*, 769 F.3d at 1100 ("Likewise, the passage that explains how the external diagnostic tester uses the 'program recognition device' to automatically check which program version is currently on the control unit only describes the connection of the external diagnostic tester to the control unit in the vehicle.") The patent does give a narrow example of selecting: routing the XML document "[b]ased upon the back-office database identification and version attributes in the header." '222 patent at 10:30-

33. This *de minimis* description is insufficient to accomplish the claimed function of selecting an adapter component.[3]  Dkt. No. 70-1 at ¶ 73.

As to the "adapter component," the specification again relies on nothing more than functional descriptions, created by the inventors, that have no definite meaning in the art. The specification identifies the content of an adapter component as including an "order status adapter 220, ship status adapter 222 or invoice status adapter 224" and "order status XML container 230, ship status XML container 232 or invoice status XML container 234." '222 patent at 10:40-42. But nowhere in the patent are the contents of these block elements explained or revealed. *See* Dkt. No. 70-1 at ¶¶ 67-69. Section 112 ¶ 6 is not satisfied by disclosing functional terms alone. *Robert Bosch*, 769 F.3d at 1100 (where disclosures "are solely functional, one of ordinary skill in the art could not find in the specification a definition of the terms as referring to a particular structure"); *Noah Systems Inc. v. Intuit Inc.,* 675 F.3d 1302, 1316-17 (Fed. Cir. 2012) ("[T]he portions of the specification that describe what occurs inside box 44, however, merely recite functional, not structural, language.")

Although the text discloses a narrow example involving a SQL adapter, that disclosure is insufficient as structure for the claimed adapter component because it relies on empty, undescribed functional blocks. Moreover, what little is described in the SQL adapter example is inherently contradictory and cannot, on its face, support an assertion of claim definiteness by Plaintiff. For example, in one particularly confusing section, the specification describes elements ***passing things to themselves***:  "Order status adapter 220, ship status adapter 222 or invoice status adapter 224 then pass a pre-built SQL statement to order status adapter 220, ship status adapter 222 or invoice

---

[3] If the Court were to find that this single sentence in the specification were somehow sufficient structure for the "selector component," the claim must be limited to the specific information in that narrow portion of the specification.

status adapter 224 respectively." '222 patent at 10:52-56. This deficient description of "adapter component," standing alone, does not meet the "structure" requirements of § 112.

As to the "integration component," the specification similarly lacks description of any structure. Like the other components, the figures only describe the "integration component" as a black box 306. The text of the specification adds nothing, only providing further confusion. In one place, the '222 patent states that "the integration component 306 . . . *comprises* DBQuery object 310." *Id.* at 9:65-64. In another, it states that the request in SOAP form "is passed to integration component 306 *and then to* DBQuery object 310 which processes the request." *Id.* at 11:4-6 (emphasis added). Thus, a POSITA cannot discern whether the structure should include DBQuery or should exclude DBQuery.

Figure 2C provides support for the case that the DBQuery object is *not* part of the integration component. If that is the case, the specification is devoid of any exemplary "integration component." But if the DBQuery is simply a *part* of the integration component structure, such disclosure is still insufficient to satisfy § 112 ¶ 6 because it would require a "knowledgeable programmer" to finish designing the structure for the integration function by writing a specific program that somehow incorporates the DBQuery object. Dkt. No. 70-1 at ¶ 31. Thus, the specification does not clearly explain a definite relationship between the integration component and the DBQuery object and thus does not provide sufficient structure. *See Noah Systems*, 675 F.3d at 1317 (holding that merely asserting that a POSITA would understand how to accomplish the function described with the assistance of off the shelf software does not resolve the inadequacy of the disclosure).

Plaintiff repeatedly points to the ability of a POSITA to "create XML markup, schemas, [and] document definitions" as supporting its position that the component terms are not indefinite.

-10-

(*See* Dkt. No. 77 at 9.)[4]   But a POSITA's ability to create generic XML is useless for the implementation of the asserted claim without some disclosure as to what structures will be using the XML to perform the claimed functions. Accordingly, the question is not whether a POSITA can program in the XML language, draft XML schema, or produce XML markup documents; rather, the question is whether the patent discloses specific structure ***with which the functional limitations perform the claimed function on an XML document***.

It may be sufficient, given example XML markups or schemas, to work backwards and arrive at the specific structure or algorithm. It is not sufficient, however, if a POSITA has to design that XML from scratch, which is the case with the '222 patent. The first scenario would have a POSITA program a functional software component when given structure in an algorithm or flowchart in the patent. The latter would require the POSITA to actually finish conceiving and reducing to practice the unfinished, key aspects of the patent's alleged invention.

Similarly, Plaintiff's contention that XML processors can "infer the rules that govern the document" without needing a separate document definition is misplaced and relies upon a reference taken out of context. *See* Dkt. No. 77, Ex. C, at E2E00001638. In context, the reference explains that XML processors know how to ***parse*** (e.g., read) an XML document to extract its information using just the XML document and no other materials. *Id*. But an arbitrary XML document, by itself, does not dictate any specific structure or algorithms to perform the functions of the selector, adapter, or integration components.

Finally, Plaintiff's contention that off-the-shelf software such as "Click Commerce" can be relied on by a POSITA to render the claims definite is also erroneous. *See* Dkt. No. 77 at 9 n.4.

---

[4] Similarly Plaintiff contends that a reader of Mr. Tittel's "Dummies" text "can readily create and reuse XML documents, schemas, and document definitions," so a POSITA should be able to do the same and more. Dkt. No. 77 at 11.

First, such software is never referenced in the four corners of the written description of the patent-in-suit and is thus irrelevant to ascertaining whether the asserted claim satisfies the statutory requirement for definiteness. *Omega Engr., Inc. v. Raytek Corp.*, 334 F.3d 1314, 1321 (Fed. Cir. 2003) ("Once the functions performed by the claimed means are identified, we must then ascertain the corresponding structures in the written description that perform those functions."). Instead, the software is referenced in the appendix of a provisional application related to the '222 patent, but never expressly incorporated by reference therein. *See* Manual of Patent Examining Procedure § 608.01(p) ("Mere reference to another application, patent, or publication is not an incorporation of anything therein into the application containing such reference for the purpose of the disclosure required by 35 U.S.C. 112."), *citing In re de Seversky*, 474 F.2d 671 (C.C.P.A. 1973).  Moreover, attempting to fill in the gaps of the specification by importing off-the-shelf software or asserting that a POSITA would understand how to accomplish the function described with the assistance of such off-the-shelf software does not resolve the failure of the specification to comply with the disclosure requirements of § 112 ¶ 6. *See Noah Systems,* 675 F.3d at 1317-18.

### 4.    Plaintiff's Proposed Constructions Are Purely Functional.

Plaintiff's constructions highlight that the claimed invention only disclosed these "components" in functional terms, and further supports holding these terms to the restrictions of § 112 ¶ 6. For all three terms, Plaintiff's constructions fail to identify whether the component is hardware, software, or both, which directly supports Defendants' assertion that the claim terms lack definite structure. *See Robert Bosch*, 769 F.3d at 1100 (no structural guidance if the term fails to identify whether the function "could be achieved by using any type of device that comprises hardware, software, or both"). And, as explained below, even if not limited by § 112 ¶ 6, each of the proposed constructions are further defective and/or indefinite for other reasons.

-12-

As to "selector component," Plaintiff construes the term as accomplishing two functions: reading the header and sending to an adapter component. But Plaintiff's construction excludes the claim term's primary function—under Plaintiff's construction, no "selecting" of any kind would be required. The entire purpose of the "selector component" is to be able to choose—in some specific way if provided with the proper algorithm—from one of several adapter components, such as from a VFP adapter 214, SQL adapter 216, or 3.2 adapter 218. *See* '222 patent at 10:30-33. Plaintiff's proposed construction simply ignores the contribution of "selector component" to the claimed method, effectively writing the function out of the claim.

As to the "adapter component," Plaintiff's construction similarly identifies only a generic function without any structure: "processing." Unlike Defendants' construction, Plaintiff's proposed construction excludes the claim language of "adapting," a function for which the specification tries to provide a narrow example via disclosure of a SQL adapter. '222 patent at 10:39-42. Furthermore, Plaintiff excludes other functions of the "adapter component" required by the specification: "invok[ing] a proxy component and defin[ing] a specific remote procedure call and parameter list." '222 patent at 10:34-36. The inventors coined this term, and Plaintiff cannot cherry pick which functional aspects the inventors used to define it.

As to the "integration component," Plaintiff also excludes a function required by the inventor's definition for the function of integrating:  "creat[ing] a return XML document with the appropriate information." Plaintiff's construction also injects uncertainty into the meaning of "integration component" by requiring that it "access the *appropriate* database." (Dkt. No. 77 at 19) (emphasis added). Nothing in the claims or specification teaches a POSITA how to determine what an "appropriate" database is or how the integration component accesses an appropriate one. Dkt. No. 70-1 at ¶ 80. The alleged purpose of the patent is to provide a generic mechanism, using

-13-

specific components, to allow a user to obtain information from a ***particular*** database chosen out of many different kinds of back-end databases. *See* '222 patent at Abstract. It is critical, therefore, that any construction of this term includes the structure or algorithm for how that "particular" database is chosen.

### B.   Preamble ("Exchanging information in a manufacturing environment between a manufacturer and a customer")

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| *The preamble is not limiting.* | *The preamble is limiting.* |
| At this time, E2E is of the view that this term does not require a construction by the Court, and should otherwise be given its plain and ordinary meaning. | the sharing of information in a manufacturing environment between a maker, by hand or by machinery, of tangible goods and a purchaser of tangible goods |

Plaintiff's position regarding the preamble ignores the relevant intrinsic evidence and incorrectly considers only the claim language in isolation.[5]  A review of the specification reveals that Plaintiff's position is untenable.

- The Field of the Invention specifies that "the present invention" particularly relates to a "manufacturing environment";

- The Background of the Invention repeatedly states that "exchanging information in a manufacturing environment" distinguishes the invention over the prior art and also discloses that the object of the invention was to solve the problems associated with exchanging information between a manufacturer and a customer;

- The Summary of the Invention highlights the manufacturing environment as an essential element demonstrating the invention's utility;

- The Detailed Description provides only one specific example of exchanging information, and it is in a manufacturing environment between a manufacturer and a customer; and

---

[5] The parties do not contend that the prosecution history provides any guidance on this issue, and neither party has submitted the prosecution history into evidence or cited to it.

- Each independent method claim begins:  "A method of exchanging information in a manufacturing environment between a manufacturer and a customer…."[6]

The specification establishes that the essence of the invention is "exchanging information in a manufacturing environment between a manufacturer and a customer." Controlling legal precedent supports Defendants' position that the preamble is limiting and should be construed as follows: "the sharing of information in a manufacturing environment between a maker, by hand or by machinery, of tangible goods and a purchaser of tangible goods."

**1.      The Specification Dictates a Finding That the Preamble Is a Limitation.**

The determination of whether a claim preamble is a limitation can only be made after "review of the entire[]. . . patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309 (Fed. Cir. 2004). As the Federal Circuit has explained, when reciting a purpose underscored as important by the specification, the preamble can operate as a claim limitation. *See Vizio, Inc. v. ITC*, 605 F.3d 1330, 1340-41 (Fed. Cir. 2010) (holding that the preamble phrase "apparatus for decoding" was "properly construed as a claim limitation, and not merely a statement of purpose or intended use for the invention, because 'decoding' [was] the essence or a fundamental characteristic of the claimed invention."). Indeed, the Federal Circuit has observed that "it is not unusual for this court to treat preamble language as limiting" when warranted. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006). Moreover, it is well settled that, "[i]f the claim preamble, when read in the context of the entire claim, . . . is 'necessary to give life, meaning, and vitality' to the claim, then the claim preamble should be construed as if in the balance

---

[6] Independent system claim 1 is similar:  "A system for passing communications between a manufacturer and a manufacturer's customer…."

of the claim." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (citation omitted).

Plaintiff argues that the preamble is not limiting because it: (1) states the "purpose or intended use of the invention," and (2) "can be deleted without affecting the structure or steps of the claim" such that it "does not provide antecedent basis" for any claim elements. Dkt. No.77 at 12-13. Plaintiff's positions are refuted by the specification and controlling precedent.[7]

Without any reference to the specification, Plaintiff argues that "a manufacturing environment" is simply a stated purpose or intended use of the invention. Dkt. No. 77 at 12. The intrinsic evidence enumerated above, however, confirms that "a manufacturing environment" is not merely a stated purpose or an intended use. "[E]xchanging information in a manufacturing environment between a manufacturer and a customer" is an essential aspect of the disclosed invention, emphasized repeatedly by the inventors as a distinction over the prior art and resolving the alleged prior art problem of information exchange in a specific environment—*i.e.*, a manufacturing environment between a manufacturer and a customer. *See infra* at 17-19.

Moreover, in *Pacing Techs,* relied upon by Plaintiff, the Federal Circuit held that the preamble phrase at issue was a limitation because it provided antecedent basis for the claim body. *See* 2015 U.S. App. LEXIS 2393, at *5 (Fed. Cir. 2015). *Pacing Techs* does not require a different result here. The Federal Circuit has repeatedly recognized that it may be appropriate to construe the preamble as limiting based upon a review of the entirety of the patent without finding

---

[7] The burden is not on Defendants to demonstrate that the preamble limits the claim as Plaintiff erroneously contends. Dkt. No. 77 at 12. Although the case law relied upon by Plaintiff states that "[g]enerally, the preamble does not limit the claims," it does not hold that Defendants bear the burden of proof on this issue. *Id.* In fact, the case law cited by Plaintiff demonstrates that claim construction is a question of law to be decided by the Court. *Id.* at 3. Accordingly, there is no "burden" assigned to Defendants.

antecedent basis. *See, e.g., Vizio*, 605 F.3d at 1340-41 (collecting cases). The preamble is not just an important characteristic of the invention—it is the key differentiator over the prior art as stated in the specification. Reading claim 7 indiscriminately to cover any information exchanged in any environment between any two persons or entities would be improper in view of the specification's focus on the prior art problem of exchanging information in a manufacturing environment. *See Gen. Elec. Co. v. Nintendo Co., Ltd*., 179 F.3d 1350, 1361-62 (Fed. Cir. 1999) (limiting claim scope to a "raster scanned display device" set forth in preamble based on specification's focus on the prior art problem of displaying binary data on a raster scan display device).

Throughout the specification, "exchanging information in a manufacturing environment" is repeatedly highlighted as an essential element demonstrating the invention's utility and distinguishing it over the prior art. *See Poly-America*, 383 F.3d at 1310 (holding that the preamble phrase "a blown-film liner" was "a fundamental characteristic of the claimed invention" because, *inter alia*, "[t]he specification [wa]s replete with references to the invention as a 'blown-film' liner"). The fact that the only detailed example provided in the Detailed Description is a system and method of exchanging information in a manufacturing environment further supports Defendants' position. *See, e.g.*, '222 patent at 8:40-42 and Fig. 5A.

The Field of Invention emphasizes that:   "***The present invention*** relates . . . more particularly, to a network based system providing a virtual market place in a . . . . ***manufacturing environment***." '222 patent at 1:15-25 (emphasis added). Next, the Background of the Invention section sets forth challenges presented when exchanging information as applied to the manufacturing industry, *id.* at 3:31-63, and thereafter distinguishes *every* prior art reference cited

-17-

in the specification (a total of six references) by stressing that the prior art does not address the challenges presented *in a manufacturing environment*. *Id.* at 4:56-5:61.[8]

The Background Section concludes by highlighting the very problem that the inventors identified to solve:  "[a]s is evident from these systems, what is needed, therefore, is a transaction and statusing system which may be used in a virtual marketplace for a *manufacturing concern*." *See* 6:6-8 (emphasis added). Additional statements in the concluding portion of the Background of the Invention specify that the inventors' solution relates to exchanging information between a manufacturer and a customer. *See* '222 patent at 6:9-10 ("Advantageously, the system should allow a customer to submit design criteria for *a make-to-order product*.") (emphasis added); *id.* at 6:13-15 ("The system should not require extensive technical support at the *manufacturing* company location.") (emphasis added).

Accordingly, the Background of the Invention demonstrates that the inventors were working on the particular problem of customer/manufacturer information exchange in a manufacturing environment, and not general improvements for all information exchange systems. The preamble is the only part of claim 7 that refers to the stated problem and advantage over the prior art disclosed in the specification. Thus, it is appropriate to construe the preamble as limiting. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989) (holding that the preamble phrase "an optical waveguide" was a limitation where the specification

---

[8] *See* '222 patent at 4:56-58 ("Anand *et al*. does not address the challenges present in a manufacturing environment."); *id.* at 5:8-10 ("Cianfrocca *et al*. does not, however, address the challenges present in a manufacturing environment."); *id.* at 5:22-25 ("Fisher *et al*. does not, however, address the challenges present in a manufacturing environment, such as calling for complex database manipulations across foreign systems."); *id.* at 5:39-40 ("Pearson does not, however, address the challenges present in a manufacturing environment."); *id.* at 5:54-55 ("Doyle *et al*. does not, however, address the challenges present in a manufacturing environment."); *id.* at 5:66-6:1 ("Dworkin does not, however, address the challenges present in a manufacturing environment.").

"makes it clear that the inventors were working on the particular problem of an effective optical communication system.").

Further, in the Summary of the Invention, the inventors emphasized that their invention was a method and system involving a manufacturer and a customer. "In *a make-to-order manufacturing environment*, the information request or transaction may be initiated at the design stage of a product. Thus, *the invention comprises* a document collaboration capability (DCC), which may be *used by the customer* to deliver specific design criteria, such as, but not limited to, computer-assisted drawings (CAD) or specification documents, *to the manufacturer.*" '222 patent at 6:42-48 (emphasis added).

Viewed in the context of the claims, the specification demonstrates that the problem to be solved involved exchanging information in a manufacturing environment and that the alleged invention was purportedly distinguishable over the prior art because it was directed to exchanging information in a manufacturing environment between a manufacturer and a customer. To read the claim as broadly as Plaintiff proposes, such that "exchanging information in a manufacturing environment between a manufacturer and a customer" is excluded, would allow the claim to cover *all* systems/methods for exchanging information, a result that would be "divorced from the reality" of the basis for granting the '222 patent. *See Corning Glass*, 868 F.2d at 1256 (construing the preamble as a limitation because "to read the claim in light of the specification indiscriminately to cover all types of optical fibers would be divorced from reality").

Plaintiff also recites the language of claim 7 with the preamble omitted, arguing that the preamble is not limiting because the preamble does not provide antecedent bases. Dkt. No. 77 at 12-13 (citing *Am. Med. Sys. v. Biolitec*, Inc., 618 F.3d 1354, 1358-59 (Fed. Cir. 2010). Although conceding that the terms "information" and "customer" appear within the claim, Plaintiff notes

-19-

that it is not with reference to "the" information or "the" customer of the preamble, taking the position that this is dispositive. (*Id.*).

Plaintiff's argument that the preamble is not limiting simply because the body of claim 7 does not, for example, refer to "the" customer of the preamble misses the mark. The *Biolitec* case cited by Plaintiff does not stand for the broad proposition that a preamble cannot be held limiting when the claim body is "structurally complete" such that the preamble does not provide a necessary antecedent basis.  Numerous Federal Circuit cases have held the preamble to be limiting as the essence of the invention despite what could be considered a "structurally complete" claim body when improperly read and divorced from the specification.  *See, e.g., Poly-America*, 383 F.3d at 1310; *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003); *Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002); *Corning Glass*, 868 F.2d at 1256. As in *Poly-America* and related cases, the preamble phrase is limiting in this case because it reflects the essence of the claimed invention giving "life and meaning" to the remainder of the claim. *See id.* Just as "a method for diagnosing an increased risk for thrombosis" in *Griffin* was considered to be limiting as necessary to give life to the manipulative steps, the steps in the present case would be rendered "empty language" and mere "academic exercises" absent the purpose recited in the preamble of every independent claim and repeatedly highlighted in the specification as the essence of the invention.

For instance, to whom is the customer directing the request for information, who is processing the request for information and in what context, and who is transmitting what type of information back to the customer?  *See Griffin*, 285 F.3d at 1033 ("In the absence of the preamble's stated objective to diagnose thrombosis, the term 'test subject' is empty language. What is one testing for, and who is a suitable subject?"). The reason "a customer" is recited in the body of

-20-

claim 7 is because the customer is providing "a request for information" to a manufacturer as recited in the preamble. If there were no manufacturer, the entire step would be meaningless. Moreover, without a manufacturer "processing" the "request for information," and eventually providing the customer with "information" relating to the results, these limitations provide for nothing but an exchange of meaningless information. Read in the context of claim 7, the specification provides that "exchanging information in a manufacturing environment between a manufacturer and a customer" is the essence of the invention necessary to give "life and meaning" to the claims.

### 2. The Specification and Dictionary Definitions Support Defendants' Construction.

Defendants propose the following construction to assist the trier of fact: "the sharing of information in a manufacturing environment between a maker, by hand or by machinery, of tangible goods and a purchaser of tangible goods." This construction is supported by the specification and the dictionary definitions cited by Defendants.

As set forth above, the specification discloses that the invention is directed to a method of "exchanging information in a manufacturing environment between a manufacturer and a customer." The dictionary definitions of "manufacture" around the time of the alleged invention in 2000 also support Defendants' proposed construction. *See, e.g.*, Ex. C, Webster's New World College Dictionary, Third Edition (1997) ("1 the making of goods and articles by hand or, esp., by machinery, often to a large scale and with division of labor"); Webster's Universal College Dictionary (1997) ("1. to make or produce by hand or machinery, esp. on a large scale"). The definitions are entirely consistent with the specification's disclosure of a manufacturer that "make[s]-to-order" and "make[s] to stock." '222 patent at 1:20-24; 3:31-34; 6:6-10; 6:42-44.

-21-

Purportedly relying on *Phillips*, Plaintiff argues that Defendants improperly "seek to import language from extrinsic dictionary definitions of 'manufacture.'"  Dkt. No.77 at 14 quoting *Phillips*, 415 F.3d, at 1320. Plaintiff's reliance on *Phillips* is misplaced. *Phillips* cautions against "heavy reliance on the dictionary ***divorced*** from the intrinsic evidence [because it] risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification." *Id*. (emphasis added). As explained above, the dictionary definitions relied upon by Defendants are not ***divorced*** from the specification but are entirely consistent with it.

Plaintiff also argues that "there is simply no basis to narrow the claim to import language from the dictionary into the claim." *Id*. (quotation omitted). Defendants' proposed construction does not narrow the preamble of the claim but only clarifies, consistent with the specification, that the manufacturer "makes" tangible goods and the customer purchases them. This is clear from the specification. In any event, in *Pacing Techs*, the Federal Circuit stated that "[w]e have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the ***present invention includes*** ....'"  2015 U.S. App. LEXIS 2393 at 7. As noted above, the Summary of the Invention states:  "***the invention comprises*** a document collaboration capability (DCC), which may be ***used by the customer*** to deliver specific design criteria, such as, but not limited to, computer-assisted drawings (CAD) or specification documents, ***to the manufacturer***." *See* '222 patent at 6:42-48 (emphasis added). This exemplary statement from the Summary of the Invention falls squarely within the type of language that the Federal Circuit has found to result in disavowal or disclaimer.

The intrinsic evidence, along with the extrinsic evidence and case law relied upon by Defendants, support the conclusion that the preamble of claim 7 is a limitation and should be defined as set forth above.

### C. "invoking an internet server application program interface component to pass the extensible markup language document to an integration component"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| At this time, E2E is of the view that this term does not require a construction by the Court, and should be given its plain and ordinary meaning. However, if the Court determines that a construction is necessary, Signal [*sic*] proposes the following:<br><br>Invoking an [internet server application program interface component] to pass to an [integration component] the processed extensible markup language document. | Invoking an [internet server application program interface component] to pass to an [integration component] the same extensible markup language document that was passed to the [selector component] and [adapter component] |

The parties disagree about the identity of "the extensible markup language document" in the above claim limitation. Whereas Plaintiff ambiguously identifies the XML document as the "processed" XML document, the Defendants' proposal clarifies that the entirety of claim 7 refers to a single XML document—regardless of whether that document is modified throughout the claimed steps—based on the term's plain language and particularly its antecedent basis.

Claim 7 states that "an extensible markup language [XML] document" is generated as part of "processing the request for information from the customer." It then refers to this document four more times: (1) "passing *the* [XML] document to a selector component;" (2) "processing header information on *the* [XML] document;" (3) "passing *the* [XML] document to an adapter component;" and (4) "invoking an internet server application program interface component to pass *the* [XML] document to an integration component" (emphasis added). In each instance—including the disputed term now at issue—the claim refers back to the document generated as part of

-23-

"processing the request for information from the customer" as "***the*** [XML] document"; there is no antecedent basis for a second XML document.

Accordingly, under the plain language of claim 7, the XML document in the disputed limitation is the same XML document that was earlier passed to the selector component and the adapter component. *See PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007) ("[T]he same terms appearing in different portions of the claims should be given the same meaning."); *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ("The words 'the use' require antecedent basis; thus, 'the use' refers to a specific 'use' rather than a previously undefined 'use.'"); *Micash Inc. v. NetSpend Corp.*, Case No. 2:12-CV-248-JRG, 2013 WL 3803470, *12 (E.D. Tex. July 17, 2013) (finding that the terms "customer" and "recipient" refer to, respectively, "the same customer" and "the same recipient" throughout an entire claim).

Nothing in the intrinsic record of the '222 patent refers to or otherwise suggests the use of multiple XML documents. Plaintiff focuses on one portion of the specification, which actually supports Defendants' construction. In the embodiment in question, server software initially generates an XML document within the meaning of claim 7 through an "application adapter" that "receives the XML header node and XML request message, and combines them into ***a single XML document*** which is then passed to [a] selector component.'"'222 Patent, at 10:25–28 (emphasis added). The selector component "reads the header node information in ***the*** XML document and sends ***the*** XML document to adapter components." *Id.* at 10:29–30 (emphasis added). In the adapter components, "***[t]he*** XML document is passed by SQL adapter in the form of an XML document object model (DOM)" (*id.* at 10:39-41) and then on to the "back-office database server computer by a SOAP call . . . passed to an integration component" (*id.* at 10:56–11:5). While it

may be processed and transmitted differently in these various steps, the XML document itself—

*i.e.*, "the XML header node and XML request message" (*id.* at 10:25–28)—remains the same.

For example, the adapter component converts "the XML DOM object into an XML

container object," via an "XML container DLL . . . that parses the incoming XML document and

populates the properties of the document." *Id.* at 10:43–48. But nothing indicates that these

"properties" in the underlying XML document change. And regardless of whether "the XML

document" is modified as it passes from component to component, neither this embodiment nor

the language of claim 7 contemplates more than a single XML document containing the customer

request for information.

> D.   **"internet server application program interface component"**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| At this time, E2E is of the view that this term does not require a construction by the Court, and should be given its plain and ordinary meaning. However, if the Court determines that a construction is necessary, Signal *[sic]* proposes the following:<br><br>An application program interface (API) component for an Internet server. | ISAPI component, which is a dynamic link library (DLL) used by Microsoft Internet Information Server (IIS) to handle requests |

"Claims mean precisely what they say." *Cent. Admixture Pharm. Servs., Inc. v. Advanced*

*Cardiac Solutions, P.C.*, 482 F.3d 1347, 1355 (Fed. Cir. 2007). In the '222 Patent, claim 7 requires

the invocation of an "internet server application program interface." All available evidence—both

intrinsic and extrinsic—shows that this term has a particular meaning within the software industry,

from which the '222 patent does not deviate.

An internet server application program interface ("ISAPI") refers to the specific application

program interface for Microsoft's web server software ("Internet Information Server," or "IIS"),

which "has its own dynamic-link library . . . ." Ex. D, Microsoft Computer Dictionary (3d ed.

1997), at 265-266. In other words, "ISAPI for Microsoft" is one of several distinct, "[p]roprietary application programming interfaces (APIs) that can be used to perform specific database operations" for a particular "Web server" (such as IIS). Ex. E, C-S. Peng et al., *Accessing existing business data from the World Wide Web*, 37 IBM Systems J. 1 (1998), at 117.[9]

This is precisely how the specification of the '222 patent refers to ISAPI—as a particular component of IIS:

> Memory 144 stores back-office database server software, such as, for example, Internet Information Service (IIS) software and an internet server application program interface (ISAPI) dynamically linked library (DLL) . . . .

222 Patent, at 8:57-61. Likewise, the specification cites to prior art (*id.* at 4:61-5:12) that provides further clarity:[10]

> In the example noted above where the web server is a Netscape Enterprise server, a Netscape API gateway is utilized. ***Where a Microsoft web server is utilized an ISAPI is utilized as the gateway to the messenger system***.
>
> . . .
>
> The messenger system is configured as a "gateway" application using a gateway module ***particular to the chosen Web server***. The messenger system includes two "gateways" to conventional Web servers—an NSAPI filter for interfacing with the Netscape Enterprise Server and an ISAPI extension for Microsoft's Internet Information Server (IIS). The NSAPI/ISAPI gateways provide a mechanism for examining HTTP requests received by conventional Web servers and selectively passing some of the requests to a messenger system for servicing as messenger system enabled requests.

---

[9] *See also* Ex. F, "internet server application programming interface" (1997), available at http://dictionary.reference.com/browse/internet+server+application+programming+interface; Ex. G, "Add a Web Search Engine to Your Application" (1997), available at http://www.txsz.net/xs/delphi/2/API/ISAPI.HTM).

[10] "[P]rior art cited in a patent . . . constitutes intrinsic evidence." *Powell v. Home Depot*, 663 F.3d 1221, 1230–31 (Fed. Cir. 2011).

Ex. H, U.S. Pat. No. 6,088,796 at 12:15-21, 20:8-39 (emphasis added). Indeed, nothing in the '222 Patent refers to an ISAPI as anything other than a component of IIS software (*see*, *e.g.*, '222 Patent, at 9:63-64.), or otherwise mentions a generic "application program interface" or API.

Plaintiff misinterprets the prosecution history of the '222 Patent in an attempt to distinguish the meaning of the full term "internet server application program interface" from its acronym, ISAPI, suggesting that the latter was "removed" during prosecution. But the Examiner merely required that the term "ISAPI" in the original application's claim language "be spelled out." Ex. I, '222 File History, Office Action mailed August 12, 2004, at 3. The applicant amended claim 7 as instructed. *See* Ex. J, '222 File History, Response to Office Action dated November 12, 2004 at 9, 12. This was consistent with the specification, which treats the full phrase and its acronym as interchangeable. *See* '222 Patent, at 8:60-61 ("an internet server application program interface (ISAPI) dynamically linked library (DLL)").

Plaintiff also argues that a claim term may not be limited to a specific embodiment described in the specification. But at a minimum, this principle does not apply when the limitation is ***found in the claim language itself***. *See*, *e.g.*, *Phillips*, 415 F.3d at 1323. A construction may not "read limitations . . . out of the claim," overlooking "structures and characteristics specifically described" therein. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950-52 (Fed. Cir. 2006). The inventors of the '222 patent chose a more specific term over broader, generic language such as "application program interface" or "API," and such "choices must be held against" the patentee. *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1348 (Fed. Cir. 2003) (construing the term "ATCC-VR2332" as a "particular strain of PRRS virus...deposited with the American Type Culture Collection (ATCC)"); *see also Vizio*, 605 F.3d at 1336-37 (finding that

the term "channel map information" required four specific "data fields" named in the MPEG-2 video standard).

Finally, Plaintiff argues that Defendants' construction would rewrite the claimed function of the ISAPI component, requiring that it be used "to handle requests" instead of being used to "pass the extensible markup language document to an integration component." But the two descriptions are not distinct—if anything, the former encompasses and is broader than the latter. More importantly, regardless of whatever functional language is used, it cannot broaden "internet server application program interface" beyond a component specific to Microsoft IIS.

## III.   CONCLUSION

For the above reasons, Defendants' constructions for the identified claim terms are correct and should be adopted.


Dated: April 7, 2015                              Respectfully submitted,

                                                  By:     */s/ Neil J. McNabnay*
                                                          Neil J. McNabnay
                                                          mcnabnay@fr.com
                                                          Texas Bar No. 24002583
                                                          David B. Conrad
                                                          Conrad@fr.com
                                                          Texas Bar No. 24049042
                                                          Ricardo J. Bonilla
                                                          rbonilla@fr.com
                                                          Texas Bar No. 24082704
                                                          **FISH & RICHARDSON P.C.**
                                                          1717 Main Street, Suite 5000
                                                          Dallas, TX 75201
                                                          (214) 747-5070 (Telephone)
                                                          (214) 747-2091 (Facsimile)

                                                          ***Counsel for Cabela's Incorporated***

By:      /s/ M. Ryan Clough
       Jared B. Briant
       M. Ryan Clough
       **FAEGRE BAKER DANIELS LLP**
       3200 Wells Fargo Center
       1700 Lincoln Street
       Denver, CO 80203-4532
       Phone: (303) 607-3500
       jared.briant@FaegreBD.com
       ryan.clough@FaegreBD.com

       Deron R. Daucus
       (TX Bar No. 00790553)
       Shannon Daucus
       (TX Bar No. 00791004)
       **THE DAUCUS FIRM, P.C.**
       821 ESE Loop 323, Suite 430
       Tyler, TX 75701
       Phone: (903) 705-1117
       ddaucus@daucusfirm.com
       sdaucus@daucusfirm.com

       ***Counsel for Defendants Crocs, Inc., and Crocs Retail, LLC***

By:      /s/ John P. Higgins
       John P. Higgins
       (N.C. State Bar No. 17442)
       Justin A. Jernigan
       (N.C. State Bar No. 38920)
       John C. Nipp
       (N.C. State Bar No. 23406)
       **Additon, Higgins & Pendleton, P.A.**
       Ballantyne Corporate Park
       11610 North Community House Rd, Suite 200
       Charlotte, North Carolina 28277-2199
       Telephone: (704) 945-6704
       Facsimile: (704) 945-6735
       jhiggins@ahpapatent.com

J. Thad Heartfield
Texas Bar No. 09346800
E-mail: thad@jth-law.com
M. Dru Montgomery
Texas Bar No. 24010800
E-Mail: dru@jth-law.com
**The Heartfield Law Firm**
2195 Dowlen Road
Beaumont, Texas 77706
Telephone: (409) 866-3318
Fax: (409) 866-5789

*Counsel for Hallmark.com, LLC*


By:     */s/ Douglas F. Stewart*
        Douglas F. Stewart
        E-mail: doug.stewart@bgllp.com
        Tel: 206-204-6271
        Washington State Bar No. 34068
        Jared Schuettenhelm
        E-mail:
        jared.schuettenhelm@bgllp.com
        Tel: 206-204-6210
        Washington State Bar No. 46181
        **Bracewell & Giuliani LLP**
        701 Fifth Avenue, Suite 6200
        Seattle, WA 98104

        LaTasha M. Snipes
        E-mail: tasha.snipes@bgllp.com
        Tel: 713-221-1495
        State Bar No. 24072504
        **Bracewell & Giuliani LLP**
        711 Louisiana St., Ste. 2300
        Houston, TX 77002

*Counsel for Nordstrom, Inc.*

-30-

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on April 7, 2015, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/ Ricardo J. Bonilla*
Ricardo J. Bonilla