**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| E2E PROCESSING, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CASE NO. 2:14-CV-36-JRG-RSP |
| | § | LEAD CASE |
| CABELA'S INCORPORATED, et al., | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

## CLAIM CONSTRUCTION
## MEMORANDUM AND ORDER

On May 8, 2015, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent No. 6,981,222. After considering the arguments made by the parties at the hearing and in the parties' claim construction briefing (Dkt. Nos. 77, 83 & 85),[1] as well as after considering the June 17, 2015 Notice of Supplemental Authority filed by Defendant Cabela's Incorporated (Dkt. No. 114), the Court issues this Claim Construction Memorandum and Order.

---

[1] Citations to documents (such as the parties' briefs and exhibits) in this Claim Construction Memorandum and Order refer to the page numbers of the original documents rather than the page numbers assigned by the Court's electronic docket unless otherwise indicated.

**Table of Contents**

I.  BACKGROUND ........................................................................................................... 3

II.  LEGAL PRINCIPLES ................................................................................................. 4

III.  THE PARTIES' STIPULATED TERMS ..................................................................... 6

IV.  CONSTRUCTION OF DISPUTED TERMS ............................................................... 6

    A.  "selector component," "adapter component," and "integration component" ....................... 7

    B.  "exchanging information in a manufacturing environment between a manufacturer and a customer" (Preamble) ...................................................................................... 19

    C.  "invoking an internet server application program interface component to pass the extensible markup language document to an integration component" ............................... 23

    D.  "internet server application program interface component" ................................................. 25

V.  CONCLUSION ........................................................................................................... 31

# I. BACKGROUND

Plaintiff has brought suit alleging infringement of United States Patent No. 6,981,222 ("the '222 Patent") by Defendants Cabela's Incorporated ("Cabela's"), Crocs, Inc., Crocs Retail LLC, Hallmark.com, LLC, and Nordstrom, Inc. (collectively, "Defendants").[2] The '222 Patent is titled "End-to-End Transaction Processing and Statusing System and Method." The '222 Patent issued on December 27, 2005, and bears an earliest priority date of October 22, 1998.[3] All of the disputed terms appear in Claim 7 of the '222 Patent, which is the only asserted claim.

In general, the '222 Patent relates to electronic commerce ("e-commerce") and the use of eXtensible Markup Language ("XML") documents. The Abstract of the '222 Patent states:

> A system and method for end-to-end transaction processing and statusing is disclosed. In one embodiment, an application server computer is used to house a variety of applications. An application accessed by a user converts a user request into an eXtensible Markup Language (XML) document. The application server computer uses a high level protocol to pass the XML document to a back office server which has access to a business' enterprise resource planning (ERP) database. The back office server performs the functions requested in the XML document, which may include complex database manipulations. Once the requested function has been performed, the back office server generates a response XML document which is passed to the application server computer using a high level protocol. The information within the response XML document is then presented to the user. According to one aspect of the invention, a navigational interface is provided which incorporates a hierarchical display of business documents based upon a dominant-subordinate relationship between the documents, the relationship between the documents being established according to a progression based on how documents are encountered in a typical business environment. The selection of a specific document constitutes the user request and the response comprises user specific information from the business entity ERP database.

---

[2] Only Defendant Cabela's Incorporated appeared at the May 8, 2015 hearing, the other Defendants having been the subject of joint motions to stay filed by Plaintiff and each of those Defendants shortly before the hearing. *See* Dkt. Nos. 89, 90, 91 & 92.

[3] Defendants submit that Plaintiff has admitted that the priority date for asserted Claim 7 is June 21, 2000, rather than the 1998 date of the earliest priority document. Dkt. No. 83 at 2 n.2.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See id.* at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312-13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314-15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis.

Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317

(citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## III. THE PARTIES' STIPULATED TERMS

In their Joint Claim Construction and Prehearing Statement, the parties submit that "[a]t this time the parties do not identify any agreed terms." Dkt. No. 70 at 1.

## IV. CONSTRUCTION OF DISPUTED TERMS

Shortly before the start of the May 8, 2015 hearing, the Court provided the parties with the Court's preliminary constructions of the disputed terms, based upon review of the parties' briefing, with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are set forth within the discussion of each term, below.

## A. "selector component," "adapter component," and "integration component"

| "selector component" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Not governed by 35 U.S.C. § 112, ¶ 6.  Plain meaning, or:<br><br>"a component that reads the header information in the XML document and sends the XML document to the adapter component" | Indefinite under Section 112 ¶ 6<br><br>Function:<br>    "selecting an adapter component"<br><br>Structure/Algorithm:<br>    None provided. |

| "adapter component" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Not governed by 35 U.S.C. § 112, ¶ 6.  Plain meaning, or:<br><br>"a component that processes an XML message for the remote back-office database server" | Indefinite under Section 112 ¶ 6<br><br>Function:<br>    "adapting for a particular remote back-office database server"<br><br>Structure/Algorithm:<br>    None provided. |

| "integration component" | |
|---|---|
| **Plaintiff's Proposed Construction** | **Defendants' Proposed Construction** |
| Not governed by 35 U.S.C. § 112, ¶ 6.  Plain meaning, or:<br><br>"a component that processes incoming information, and accesses the appropriate database to retrieve the requested information or perform the requested manipulation" | Indefinite under Section 112 ¶ 6<br><br>Function:<br>    "integrating to retrieve the requested information"<br><br>Structure/Algorithm:<br>    None provided. |

Dkt. No. 77 at 14-15 & 19; Dkt. No. 83 at 1-2.

Shortly before the start of the May 8, 2015 hearing, the Court provided the parties with the following preliminary constructions: "selector component" is not a means-plus-function term and means "a component that reads the header information in the XML document, selects an adapter component based on that header information, and sends the XML document to the selected adapter component"; "adapter component" is not a means-plus-function term and means "a component that enables preprocessing of the XML message, invokes a proxy component, and defines a specific remote procedure call and parameter list"; and "integration component" is not a means-plus-function term and means "a component that processes incoming information, accesses the appropriate database to retrieve the requested information or perform the requested manipulation, and creates a return XML document with the appropriate information."

At the May 8, 2015 hearing, both sides agreed to the Court's preliminary construction as to "selector component." Plaintiff also agreed with the Court's preliminary constructions as to "adapter component" and "integration component," but Defendant Cabela's was opposed.

(1) The Parties' Positions

Plaintiff argues:

The Component Terms lack all of the "hallmarks of a means-plus-function limitation," namely: (1) that the limitation is "expressed in terms using the words 'means' or 'step'," (2) "a specified function follows the 'means' or 'step' and is linked to the 'means' or 'step'," and (3) "there is insufficient structure, materials, or acts set out in the claim for achieving the specified function." *Lodsys, LLC v. Brother Int'l Corp.*, 2013 U.S. Dist. LEXIS 85614, at *117 [(2013 WL 2949959, at *40)] (E.D. Tex. June 14, 2013). None of these hallmarks are shown, and Defendants cannot overcome the strong presumption that Section 112(f) [(35 U.S.C. § 112, ¶ 6)] does not apply.

Dkt. No. 77 at 5. Alternatively, Plaintiff argues that no "formal description of the XML" is necessary because "[c]reating a formal description of XML is well within the abilities of a novice programmer." Dkt. No. 77 at 2. That is, Plaintiff argues, "there are different ways to

write source code to carry out a given function, and this choice of implementation in code is precisely the skill that is possessed by a POSA [(person of ordinary skill in the art)]." *Id.* at 9.

Defendants respond that "Defendants do not contend that the 'extensible markup language document' claim limitation renders claim 7 indefinite. Rather, claim 7 is indefinite because each of the claimed 'components' identify a function without structure." Dkt. No. 83 at 3. "The inventors coined the component terms to describe key steps of the claimed method," Defendants argue, "but the '222 patent provides insufficient guidance on how to construct what is claimed." *Id.* For example, Defendants argue that "[a]lthough the words 'adapter' and 'component' may have individual meanings in the art, those meanings are, at best, generic and not the type of 'well understood meaning' that would confer the term 'adapter component' with sufficient structure." *Id.* at 5.

Plaintiff replies that whereas "the specified function must come from the claim language itself and cannot be read into the claims from the specification," "the claims do not recite the purported 'functions' that [Defendants] identify." Dkt. No. 85 at 1. Plaintiff also reiterates that "the term 'component' is not a nonce word, but rather recites sufficiently definite structure in the form of a software program." *Id.* at 2. Alternatively, Plaintiff argues that the specification discloses algorithms. *See id.* at 3-4.

<u>(2) Analysis</u>

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent

claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120.

(a)  Whether the Disputed Terms Are Mean-Plus-Function Terms

Title 35 U.S.C. § 112, ¶ 6 provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

> It is well settled that [a] claim limitation that actually uses the word "means" invokes a rebuttable presumption that [35 U.S.C] § 112, ¶ 6 applies.  By contrast, a claim term that does not use "means" will trigger the rebuttable presumption that § 112, ¶ 6 does not apply.  The term "means" is central to the analysis.

*Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371-1372 (Fed. Cir. 2003) (citations and internal quotation marks omitted); *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) ("[A] claim term that does not use 'means' will trigger [a] rebuttable presumption that [35 U.S.C.] § 112 ¶ 6 does not apply.").

Although *Lighting World* characterized this presumption against means-plus-function treatment as "a strong one," the Court of Appeals for the Federal Circuit recently abrogated *Lighting World* in this regard.  *See Williamson v. Citrix Online, LLC*, --- F.3d ----, 2015 WL 3687459, at *7 (Fed. Cir. June 16, 2015).

Instead, "[t]he standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.  When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to 'recite sufficiently definite

structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* (citations and internal quotation marks omitted).

Claim 7 of the '222 Patent recites (emphasis added):

> 7. A method of exchanging information in a manufacturing environment between a manufacturer and a customer, comprising the steps of:
>
>> initiating a logical session between a customer and an application server;
>> receiving from a customer a request for information;
>> processing the request for information from the customer, including generating an extensible markup language document, passing the extensible markup language document to a *selector component*, processing header information on the extensible markup language document, and passing the extensible markup language document to an *adapter component*;
>> transmitting the processed request for information to a remote back-office database server, including
>>
>>> invoking a remote procedure call to a remote database system through a proxy object, and
>>> invoking an internet server application program interface component to pass the extensible markup language document to an *integration component*;
>>
>> receiving information from the back-office database server; and
>> transmitting to the customer the information received.

Defendants' expert has opined that the term "component" "can be applied to either hardware or software" and "[w]hen used in a software context a component generally refers to 'a software package or module that encapsulates a set of related functions or data, though many definitions also mention interfaces, context dependencies, and other characteristics related to inputs and outputs." Dkt. No. 70, Ex. A, 2/10/2015 Declaration of Edward R. "Ed" Tittel at ¶ 35 (footnotes omitted). Further, Defendants' expert opines:

> The functional terms used in the '222 Patent – namely, adapter and component, with numerous modifiers for each one . . . convey some general notion of what kind of function they are supposed to perform, but never do they (or the patent language surrounding them) manage to explain how a person of ordinary skill in the art is to implement such functions, what kinds of inputs such functions are to operate upon, and what outputs such functions are intended to produce.

*Id.* at ¶ 59.

On one hand, in some circumstances the use of a generic word that does not connote structure to a person of ordinary skill in the art can result in rebuttal of the presumption against means-plus-function treatment for terms that do not use the word "means." *See Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014) (affirming findings of indefiniteness as to "program recognition device" and "program loading device," finding "'device' to be a non-structural, 'nonce' word" and finding that "the other words do nothing more than identify functions for the 'device' to perform");[4] *see also id.* at 1100 ("Likewise, the passage that explains how the external diagnostic tester uses the 'program recognition device' to automatically check which program version is currently on the control unit only describes the connection of the external diagnostic tester to the control unit in the vehicle."); *id.* ("the [patent-in-suit] is silent on what . . . a 'program loading device' consists of; the loading could be achieved by using any type of device that comprises hardware, software, or both").[5]

On the other hand, the "prefix" that appears before a purported nonce word may impart structural meaning. *Williamson*, 2015 WL 3687459, at *8; *see id.* ("the presence of modifiers can change the meaning of 'module'"). Further, "the essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.*, at *6 (citing *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996)); *see*

---

[4] *Citing Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998).

[5] Defendants have also cited *Kwik Products, Inc. v. National Express, Inc.* as an example of a term without a "well understood meaning in the art" being held subject to means-plus-function analysis. Dkt. No. 83 at 5 (citing 179 F. App'x 34, 39 (Fed. Cir. 2006)). The term at issue in *Kwik Products*, however, was "clamping means," and the court merely found that "[e]ven assuming that the term 'clamp' had a reasonably well understood meaning in the art, a clamp is not the same as a clamping means." *Id.*

*Greenberg*, 91 F.3d at 1583 (because "detent mechanism" refers to a type of device with an understood meaning in the mechanical arts, term was not a means-plus-function term"); *see also id.* ("[T]he fact that a particular mechanism—here 'detent mechanism'—is defined in functional terms is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of section 112(6). Many devices take their names from the functions they perform. The examples are innumerable, such as 'filter,' 'brake,' 'clamp,' 'screwdriver,' or 'lock.'").

At the May 8, 2015 hearing, Defendant Cabela's urged that the word "component" merely refers to software in general and requires disclosure of an algorithm in the specification. Defendant Cabela's emphasized *Bosch*, including the finding therein that "the specification does not teach how" the limitation at issue operates. *Bosch*, 769 F.3d at 1100. Plaintiff responded that the problem in *Bosch* was that the limitation at issue could have been "hardware, software, or both." *Id.* Here, Plaintiff submits, Defendant acknowledges that the word "component" is being used in a software context.

As to the "selector component," at the May 8, 2015 hearing the parties agreed to the Court's above-noted preliminary construction that "selector component" is not a means-plus-function term.

This now-agreed-upon finding comports with the context provided by the specification, which discloses:

> Application adapter 206 receives the XML header node and XML request message, and combines them into a single XML document which is then passed to selector component 208. *Selector component 208 reads the header node information in the XML document and sends the XML document to adapter components 210.* Based upon the back-office database identification and version attributes in the header, the XML document is *routed* to either VFP adapter 214, SQL adapter 216 or 3.2 adapter 218.

'222 Patent at 10:25-33 (emphasis added). This disclosure supports Plaintiff's position that a person of ordinary skill in the art would understand a "selector component" as a particular software structure. Further, the specification thus provides context as to the "inputs and outputs" and how the "selector component" "interacts with other components . . . in a way that . . . inform[s] the structural character of the limitation-in-question or otherwise impart[s] structure." *Williamson*, 2015 WL 3687459, at *8.

As to "adapter component" and "integration component" the specification discloses:

> *Adapter components 210 enable preprocessing of the XML message, invoke a proxy component and define a specific remote procedure call and parameter list.* Referring to FIG. 2C which shows additional detail of the modules within memory 124, an example of the function of *adapter components 210* is defined. The XML document is passed by SQL adapter 216 in the form of an XML document object model (DOM) object to either *order status adapter 220*, *ship status adapter 222* or *invoice status adapter 224*. The applicable status adapter then accesses XML container dynamically linked library (DLL) 226 in order to convert the XML DOM object into an XML container object. XML container DLL 226 comprises components that parse the incoming XML document and populates the properties of the document. Thus, the message from order status adapter 220, ship status adapter 222 or invoice status adapter 224 is passed to order status XML container 230, ship status XML container 232 or invoice status XML container 234 respectively and an XML container object is returned. Order status adapter 220, ship status adapter 222 or invoice status adapter 224 then pass a pre-built SQL statement to order status adapter 220, ship status adapter 222 or invoice status adapter 224 respectively. The SQL statement is then passed to back-office database server computer 140 by a SOAP call through rope proxy 212.
>
> SPA object 240 receives any documents which cannot be passed to back-office database server computer 140 by a SOAP call through rope proxy 212. Thus, transmissions which fail due to Internet timeouts, database timeout and other reasons are collected into MSMQ SPA 242, and the system attempts to re-transmit the document in an asynchronous manner.
>
> Referring now to FIG. 3, software modules within memory 144 of back-office database server computer 140 are illustrated. The incoming SOAP call is received by IIS 302. IIS 302 provides for communication between back-office database server computer 140 and application server computer 120. The incoming SOAP call is passed to *integration component 306* and then to DBQuery object 310 which *processes the SOAP call and accesses the*

*appropriate database to retrieve the requested information or perform the requested manipulation.*

As shown in FIG. 1, database memory 164, which represents the business entity's ERP database, is located within intranet 160, which in this embodiment is located on a separate device from back-office database server computer 140. Those of skill in the art will recognize, however, that in accordance with the disclosures herein, the exact location of the databases to be accessed is not significant. The salient features are that the databases are accessible by back-office database server computer 140, and located remote from application server 120. Once the information is retrieved or the manipulation effected, *integration component 306 creates a return XML document with the appropriate information*. The return XML document follows a reverse transmission path from the request XML document, such that the data from ERP database 164 is ultimately displayed to the user.

'222 Patent at 10:34-11:24 (emphasis added); *see id.* at 9:63-64 ("integration component 306 which comprises DBQuery object 310").

On balance, this disclosure supports Plaintiff's position that a person of ordinary skill in the art would understand "adapter component" and "integration component" as particular software structures. Further, the specification thus provides context as to the "inputs and outputs" and how the "adapter component" and "integration component" "interact[] with other components . . . in a way that . . . inform[s] the structural character of the limitation[s]-in-question or otherwise impart[s] structure." *Williamson*, 2015 WL 3687459, at *8. In other words, the above-quoted disclosures provide sufficient context such that the prefixes "adapter" and "integration" impart sufficient structural meaning to the disputed terms. *Williamson*, 2015 WL 3687459, at *8; *see Greenberg*, 91 F.3d at 1583.

Finally, at the May 8, 2015 hearing Defendant Cabela's argued that there is no disclosed structure for "process[ing] incoming information" or "access[ing] the appropriate database" as set forth in Plaintiff's proposed construction for "integration component." Defendant Cabela's cited *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382-83 (Fed. Cir. 2009). To

whatever extent Defendants maintain that this is a basis for finding indefiniteness, such an argument improperly conflates the issue of whether a term is a means-plus-function term with the issue of whether the specification discloses corresponding structure for a term that has been found to be a means-plus-function term. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1296-97 (Fed. Cir. 2014) (noting that these inquiries are "distinct").

The Court therefore hereby expressly rejects Defendants' argument that these disputed terms are means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6.

(b) Construction

Plaintiff argues that no construction is necessary, but Defendants urge that "[t]he inventors coined the component terms to describe key steps of the claimed method." Dkt. No. 83 at 3.

Although the disputed terms connote structure (as discussed above), these are "coined" terms, and the specification thus provides the meanings for these terms. *See Intervet Inc. v. Merial Ltd.*, 617 F.3d 1282, 1287 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1315) ("Idiosyncratic language, highly technical terms, or terms coined by the inventor are best understood by reference to the specification.");[6] *cf. Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("[A]pplicant informed the examiner and all competitors that the 'key' modifiers—'service,' 'group,' and 'box'—have no accepted meaning in the art and 'are very adequately described in the specification.' The applicant's use of those terms in the specification thus controls their scope."). Construction is therefore appropriate to

---

[6] *See also MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1376 (Fed. Cir. 2007) ("Both parties agree that the term NSP is a coined term, without a meaning apart from the patent. As construed, all the asserted claims involve communicating with the ASP through a connection established by the NSP. We therefore look to the specification to determine what the NSP must do when establishing that communication link.") (citing *Phillips*, 415 F.3d at 1316-17).

resolve the parties' disputes as to the scope of these terms and to assist the finder of fact in understanding these terms. *See TQP Dev., LLC v. Merrill Lynch & Co., Inc.*, No. 2:08-CV-471, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, J.) ("The Court believes that some construction of the disputed claim language will assist the jury to understand the claims.").

As to the "selector component," the parties agreed to the Court's preliminary construction at the May 8, 2015 hearing, as noted above.

As to the "adapter component," Defendants urge that this component must "invoke a proxy component and define a specific remote procedure call and parameter list" as set forth in the specification. Dkt. No. 83 at 13; '222 Patent at 10:35-36 (quoted above). Because this is a coined term, the Court construes "adapter component" as having the disclosed characteristics: "enable preprocessing of the XML message, invoke a proxy component[,] and define a specific remote procedure call and parameter list." *Id.* at 10:34-36.

At the May 8, 2015 hearing, Defendant Cabela's argued that the Court's preliminary construction for "adapter component" was unclear because "preprocessing" lacks clear meaning. Defendants' expert has opined that "[t]he details as to what kind of preprocessing is to be performed are not disclosed," but Defendants' expert has also opined that "[i]n general computer science terms, preprocessing a file means reading and interpreting its contents, then applying various transforms or substitutions to create a new file based on, but not identical to, the original." Dkt. No. 70, Ex. A, 2/10/2015 Tittel Decl. at ¶ 64 & n.27. Further, Defendant Cabela's expressed at the May 8, 2015 hearing that the meaning of "preprocessing" may or may not be an issue depending upon whether Plaintiff's infringement contentions are amended. Upon the present record, the dispute, if any, underlying "preprocessing" appears to relate to factual issues of infringement rather than legal issues of claim construction. *See PPG Indus. v.*

*Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("[A]fter the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact.").

As to the "integration component," Defendants argue that Plaintiff's proposal improperly excludes "creat[ing] a return XML document with the appropriate information." Dkt. No. 83 at 13. Because this is a coined term, the Court construes "integration component" as proposed by Plaintiff but with the addition that, as disclosed, the "integration component" "creates a return XML document with the appropriate information." '222 Patent at 11:19-21 (quoted above). As to the disclosure that what is processed by the "integration component" is a "SOAP call" (*see id.* at 11:4-5 (quoted above)), however, use of the Simple Object Access Protocol ("SOAP") is a specific feature of a particular disclosed embodiment that should not be imported into the claim. *See, e.g., Comark*, 156 F.3d at 1187.

Finally, to whatever extent Defendants are disputing the capabilities of a person of ordinary skill in the art to implement the claimed invention based on the disclosure in the specification, such arguments perhaps might pertain to enablement but are not relevant to the present claim construction proceedings. *See* Dkt. No. 83 at 3 ("the '222 patent provides insufficient guidance on how to construct what is claimed"); *Phillips*, 415 F.3d at 1327 ("[W]e have certainly not endorsed a regime in which validity analysis is a regular component of claim construction.").

The Court accordingly hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| "selector component" | "a component that reads the header information in the XML document, selects an adapter component based on that header information, and sends the XML document to the selected adapter component" |
| "adaptor component" | "a component that enables preprocessing of the XML message, invokes a proxy component, and defines a specific remote procedure call and parameter list" |
| "integration component" | "a component that processes incoming information, accesses the appropriate database to retrieve the requested information or perform the requested manipulation, and creates a return XML document with the appropriate information" |

**B. "exchanging information in a manufacturing environment between a manufacturer and a customer" (Preamble)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| The preamble is not limiting | The preamble is limiting<br><br>"the sharing of information in a manufacturing environment between a maker, by hand or by machinery, of tangible goods and a purchaser of tangible goods" |

Dkt. No. 77 at 12; Dkt. No. 83 at 14.

Shortly before the start of the May 8, 2015 hearing, the Court provided the parties with its preliminary construction that the preamble is not limiting.

(1) The Parties' Positions

Plaintiff argues that "the preamble merely states the purpose or intended use of the invention, can even be deleted without affecting the structure or steps of the claim, and does not

provide antecedent basis for any elements recited in the body of the claim – all of which demonstrate that it is not limiting." Dkt. No. 77 at 2; *see id.* at 12-14. As to Defendants' proposed construction, Plaintiff argues that "Defendants seek to import language from extrinsic dictionary definitions of 'manufacture' . . . ." *Id.* at 14.

Defendants respond: "'[E]xchanging information in a manufacturing environment between a manufacturer and a customer' is an essential aspect of the disclosed invention, emphasized repeatedly by the inventors as a distinction over the prior art and resolving the alleged prior art problem of information exchange in a specific environment . . . ." Dkt. No. 83 at 16. Defendants also argue that even though the preamble may not provide explicit antecedent basis for terms recited in the body of the claim, "the reason 'a customer' is recited in the body of claim 7 is because the customer is providing 'a request for information' to a manufacturer as recited in the preamble. If there were no manufacturer, the entire step would be meaningless." *Id.* at 20-21.

Plaintiff replies that "the patentees never made any distinction based on the definition of "manufacturer" being "a maker, by hand or by machinery, of tangible goods" or a customer being "a purchaser of tangible goods." Dkt. No. 85 at 6. Likewise, Plaintiff urges that in discussing prior art, "[t]he patentees never indicated that any particular difference was 'key' or that addressing such challenges [('challenges present in a manufacturing environment')] was the only distinguishing factor." *Id.*

### (2) Analysis

In general, a preamble limits the invention if it recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes*[*, Inc. v. Hewlett-Packard Co.*], 182 F.3d [1298,] 1305 [(Fed. Cir. 1999)]. Conversely, a preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a

purpose or intended use for the invention." *Rowe v. Dror*, 112 F.3d 473, 478,
42 USPQ2d 1550, 1553 (Fed. Cir. 1997).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *see, e.g.,*

*In re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1348 (Fed. Cir. 2002) (finding the preamble

limiting because of "clear reliance by the patentee on the preamble to persuade the Patent Office

that the claimed invention is not anticipated by the prior art"); *Eaton Corp. v. Rockwell Int'l*

*Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely

upon and derive antecedent basis from the preamble, then the preamble may act as a necessary

component of the claimed invention.").

Defendants urge that a "manufacturing" limitation is warranted based on various

disclosures in the specification, including in the Field of the Invention, the Background of the

Invention, the Summary of the Invention, and the Detailed Description. *See* Dkt. No. 83 at 17-18

(citing '222 Patent at 1:15-25, 3:31-63, 4:56-6:1, 6:6-10, 6:13-15, 6:42-48 & 8:40-42). In some

circumstances, statements characterizing the invention as a whole can warrant a narrow

construction. *See Regents of the Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir.

2013) ("When a patent . . . describes the features of the 'present invention' as a whole, this

description limits the scope of the invention.") (quoting *Verizon Servs. Corp. v. Vonage Holdings*

*Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)); *see also Honeywell Int'l, Inc. v. ITT Indus., Inc.*,

452 F.3d 1312, 1318 (Fed. Cir. 2006) (construing term in light of description of "the present

invention").

Defendants have also cited various cases in which the court either found a preamble

limiting or noted that preamble language can be found limiting. *See Vizio, Inc. v. Int'l Trade*

*Comm'n*, 605 F.3d 1330, 1340-41 (Fed. Cir. 2010) ("[W]e conclude that the 'for decoding'

language in the preamble . . . is properly construed as a claim limitation, and not merely a

statement of purpose or intended use for the invention, because 'decoding' is the essence or a fundamental characteristic of the claimed invention"); *see also Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir. 2004) (finding the preamble term "blown-film" limiting where: "The specification is replete with references to the invention as a 'blown-film' liner, including the title of the patent itself and the 'Summary of the Invention.' The phrase is used repeatedly to describe the preferred embodiments, and the entire preamble 'blown-film textured liner' is restated in each of the patent's seven claims. Our analysis shows that the inventor considered that the 'blown-film' preamble language represented an important characteristic of the claimed invention.").[7]

On balance, the preamble of Claim 7 (which is reproduced in the discussion of the "component" terms, above) does not provide antecedent basis for any term recited in the body of the claim and is not "necessary to give life, meaning, and vitality" to the claim. *Catalina Mktg.*, 289 F.3d at 808. In particular, as Plaintiff has noted, the term "manufacturer" does not appear anywhere in the body of the claim. Instead, the preamble's reference to manufacturing is merely

---

[7] *See also Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) ("it is not unusual for this court to treat preamble language as limiting"); *id.* ("if the claim drafter chooses to use both the preamble and the body to define the subject matter of the claimed invention, the invention so defined, and not some other, is the one the patent protects") (citation and internal quotation marks omitted); *Gen. Elec. Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1361-62 (Fed. Cir. 1999) (as to the preamble "A system for displaying a pattern on a raster scanned display device by mapping bits from a display location in a memory associated with a computer onto the raster," finding: "Here, the . . . specification makes clear that the inventors were working on the particular problem of displaying binary data on a raster scan display device and not general improvements to all display systems. In light of the specification, to read the claim indiscriminately to cover all types of display systems would be divorced from reality"); *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1256-57 (Fed. Cir. 1989) (similar); *Jansen v. Rexall Sundown, Inc.*, 342 F.3d 1329, 1333 (Fed. Cir. 2003); *Griffin v. Bertina*, 285 F.3d 1029, 1033 (Fed. Cir. 2002) (regarding "A method for diagnosing an increased risk for thrombosis or a genetic defect causing thrombosis," finding that "[i]n the absence of the preamble's stated objective to diagnose thrombosis, the term 'test subject' is empty language. What is one testing for, and who is a suitable subject?").

a "purpose or intended use for the invention." *Id.* Also of note, Defendants have *not* shown that

the patentee relied upon the "manufacturer" language in the preamble in order to overcome any

rejection by the patent examiner. Defendants' proposal to include a manufacturing limitation

would thus improperly limit the claim to features of a preferred embodiment.[8]

The Court therefore hereby expressly rejects Defendants' proposal that the preamble of

Claim 7 is limiting. No further construction is necessary.

## C. "invoking an internet server application program interface component to pass the extensible markup language document to an integration component"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning, or:<br><br>"invoking an [internet server application program interface component] to pass to an [integration component] the processed extensible markup language document" | "invoking an [internet server application program interface component] to pass to an [integration component] the same extensible markup language document that was passed to the [selector component] and [adapter component]" |

Dkt. No. 77 at 16 (square brackets Plaintiff's); Dkt. No. 83 at 23 (square brackets Defendants').

Shortly before the start of the May 8, 2015 hearing, the Court provided the parties with

the following preliminary construction: "Plain and ordinary meaning."

Plaintiff has argued:

[C]laim [7] recites that: 1) an XML document is generated, 2) header information on the document is processed, 3) the document is passed to an adapter component, 4) the processed request is passed to a database server, and 5) the document is passed to an integration component.

The specification teaches that these steps can involve modifications to the document.

---

[8] The parties appear to dispute whether Defendants bear a burden of proof to demonstrate that the preamble is limiting. *See* Dkt. No. 77 at 12; Dkt. No. 83 at 16 n.7. The Court need not evaluate whether any such burden exists because even in the absence of any presumption or burden, the Court finds that the preamble of Claim 7 is not limiting.

Dkt. No. 77 at 17.  Plaintiff has urged that "the XML document is not limited to a single piece of data that remains unchanged from its inception to when it is passed to the integration component. Instead, its content can be modified as it is processed by, and transferred between, the various components in the system."  *Id.* at 18.

Defendants have responded that "[w]hereas Plaintiff ambiguously identifies the XML document as the 'processed' XML document, the Defendants' proposal clarifies that the entirety of claim 7 refers to a single XML document—regardless of whether that document is modified throughout the claimed steps—based on the term's plain language and particularly its antecedent basis."  Dkt. No. 83 at 23.  Defendants have emphasized that in Claim 7, "there is no antecedent basis for a second XML document."  *Id.* at 24.

Plaintiff has replied that "neither the claim nor Defendants' proposed construction requires a 'single' XML document.  Moreover, requiring a 'single' document is improper and confusing for the same reasons as requiring the 'same' document, namely that computers store documents as bits of data in different locations, on different computer systems, in different formats."  Dkt. No. 85 at 8.

At the May 8, 2015 hearing, both sides agreed to the Court's preliminary construction of this term as having its plain and ordinary meaning.  Both sides also expressed a mutual understanding that although "the extensible markup language document" refers to the same XML document throughout the claim, that XML document could be processed or modified yet still be the "same" XML document.

The Court therefore hereby construes **"invoking an internet server application program interface component to pass the extensible markup language document to an integration component"** to have its **plain meaning** (apart from construction of the constituent

term "internet server application program interface component," which is addressed below). In so construing this disputed term, the Court expressly relies upon the mutual understanding explained by the parties at the May 8, 2015 hearing that although "the extensible markup language document" refers to the same XML document through the claim, the claim does not preclude modification of that extensible markup language document.

## D. "internet server application program interface component"

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain meaning, or:<br><br>"an application program interface (API) component for an Internet server" | "ISAPI component, which is a dynamic link library (DLL) used by Microsoft Internet Information Server (IIS) to handle requests" |

Dkt. No. 77 at 20; Dkt. No. 83 at 25.

Shortly before the start of the May 8, 2015 hearing, the Court provided the parties with the following preliminary construction: "ISAPI component, which is a dynamic link library (DLL) used by Microsoft Internet Information Server (IIS)."

(1) The Parties' Positions

Plaintiff argues that "[w]hile th[e] example [of a specific Microsoft 'DLL' and 'IIS' technology] is provided in the specification, the claims of the patent are not limited to the examples provided in the specification." Dkt. No. 77 at 3; *see id.* at 21 (citing '222 Patent at 8:55-63). Plaintiff also argues that Defendants' proposed construction is incorrect because "[i]n the claim, the component is used to 'pass the extensible markup language document to an integration component,' which Defendants' construction converts to a component used 'to handle requests.' Passing information is the opposite of handling requests for information – in the former information is being sent, but in the latter it is being received." Dkt. No. 77 at 22.

25

Defendants respond that the term "internet server application program interface" is a term of art that "refers to the specific application program interface for Microsoft's web server software ('Internet Information Server,' or 'IIS') . . . ." Dkt. No. 83 at 25. Defendants emphasize that "nothing in the '222 Patent refers to an ISAPI as anything other than a component of IIS software (*see*, *e.g.*, '222 Patent, at 9:63-64.), or otherwise mentions a generic 'application program interface' or API." Dkt. No. 83 at 27. As for the prosecution history, Defendants submit that "the Examiner merely required that the term 'ISAPI' in the original application's claim language 'be spelled out.'" *Id.* (citing *id.*, Ex. I, 8/12/2004 Office Action at 3). Defendants conclude that contrary to Plaintiff's invocation of the general rule that claims should not be limited to specific features of preferred embodiments, here "the limitation is found in the claim language itself." Dkt. No. 83 at 27 (emphasis omitted). Finally, Defendants submit that the phrase "to handle requests" is broader than, and encompasses, the concept of "pass[ing]." *Id.* at 28.

Plaintiff replies that whereas "Defendants . . . rely primarily on extrinsic dictionary definitions for the term "*I*nternet *S*erver *A*pplication *P*rogramming *I*nterface," "the specification and claims refer to 'internet server application program interface component,' a broader term using all *lowercase* letters to indicate that it does not refer to a particular API provider." Dkt. No. 85 at 8 (citing '222 Patent at 8:59-60 & 19:25). Plaintiff emphasizes that "the claim makes no reference whatsoever to Microsoft, 'DLL,' or 'IIS' technology that Defendants seek to add to the claim." Dkt. No. 85 at 9. Finally, Plaintiff replies that even assuming that "handling" encompasses "passing," "this is only further evidence that Defendants' construction improperly narrows the claim in an arbitrary and unjustified manner." *Id.* at 10.

(2)  Analysis

Plaintiff appears to acknowledge that "ISAPI" is commonly used as an acronym for a dynamic link library ("DLL") used by Internet Information Server ("IIS"), a product of Microsoft Corporation.  *See* Dkt. No. 77 at 20-21; *see also* Dkt. No. 85 at 8 (quoted above); Dkt. No. 83, Ex. B (identified by Defendants as Provisional Application No. 50-225339, App'x A (Dkt. No. 83 at 7)) at 8 (discussing ISAPI in the context of Microsoft IIS).

Also, Defendants have submitted extrinsic evidence in this regard.  *See* Dkt. No. 70, Ex. A, 2/10/2015 Tittel Decl. at ¶¶ 27-28 ("IIS and ISAPI are both Microsoft technologies"); *see also* Dkt. No. 83, Ex. D, *Microsoft Press Computer Dictionary* 265-66 (3d ed. 1997) ("Acronym for *I*nternet *S*erver *A*pplication *P*rogramming *I*nterface.  An easy-to-use, high-performance interface for back-end applications for Microsoft's Internet Information Server (IIS).  ISAPl has its own dynamic-link library, which offers significant performance advantages over the CGI (Common Gateway Interface) specification."); *see id.*, Ex. E, C.-S. Peng, et al., *Accessing existing business data from the World Wide Web*, IBM Systems J., vol. 37, no. 1 (1998) at 117 ("Proprietary application programming interfaces (APIs) that can be used to perform specific database operations have also been developed for popular Web servers.  Examples of such interfaces are ISAPI for Microsoft . . . .").

Plaintiff has not identified any expert opinion in support of its apparent contention at the May 8, 2015 hearing that the term ISAPI is not known in the art to refer to a component used by Microsoft IIS.  A review of the submitted declaration of Plaintiff's expert reveals no such opinion (aside from, in the penultimate paragraph, a categorical agreement with Plaintiff's claim construction positions).  *See* Dkt. No. 70, Ex. B, 2/10/2015 Smedley Decl.  Also, although

Plaintiff suggested at the May 8, 2015 hearing that "ISAPI" could be used with products other than Microsoft's, such as "Apache," Plaintiff has not submitted any evidence in that regard.

The claim originally recited "ISAPI," and the patentee spelled out the "ISAPI" acronym as "internet server application program interface" in response to an objection by the examiner. *See* Dkt. No. 77, Ex. F, 11/12/2004 Response to Office Action at 9 & 12; *see also* Dkt. No. 83, Ex. I, 8/12/2004 Office Action at 3 ("Claim 12 is objected to because of the following informalities: The acronym elements RPC and ISAPI should be spelled out. Appropriate correction is required.").

Plaintiff argues that "[i]t is impermissible to read back into the claims limitations that were removed during prosecution." Dkt. No. 77 at 22 n.7 (citing *Laryngeal Mask Co. Ltd. v. Ambu A/S*, 618 F.3d 1367, 1372-73 (Fed. Cir. 2010) (citing *Kistler Instrumente Ag v. United States*, 628 F.2d 1303 (Ct. Cl. 1980) ("[D]efendant's insist[e]nce upon this court's reading back into the claims limitations which were originally there and were removed during prosecution of the application through the Patent Office cannot be permitted.")). Plaintiff also urges that "[t]he term 'application program interface,' or 'API,' is commonly used in the software industry to refer to a set of routines, protocols, and tools for building software applications. In the claim, the API in question pertains generally to an 'internet server,' but is not limited to a specific type of server or specific set of APIs from a particular company such as Microsoft." Dkt. No. 77 at 20 (footnote omitted).

Because the patentee did not remove the "ISAPI" limitation entirely but rather merely spelled out that acronym in response to the examiner's objection, any rule against "read[ing] back into the claims limitations that were removed during prosecution" is inapplicable. *Laryngeal Mask*, 618 F.3d at 1372-73.

As to the proper construction, the specification refers to "back-office database server software, such as, for example, Internet Information Service (IIS) software and an internet server application program interface (ISAPI) dynamically linked library (DLL)." '222 Patent at 8:57-61. At first blush, this reference to IIS and ISAPI as part of an "example" weighs against including such limitations in the construction of the disputed term. *Id.* Moreover, the Court of Appeals for the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1311.

Nonetheless, the patentee used a term with a well-known meaning in the relevant art (as discussed above), and the specification contains no clear basis for departing from that well-known meaning. Under such circumstances, the well-known meaning in the relevant art applies. *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1348 (Fed. Cir. 2003) (construing the term "ATCC-VR2332" as a "particular strain of . . . virus . . . deposited with the ATCC [(American Type Culture Collection)]"; "Boehringer did not choose to define the term 'ATCC-VR2332' in the specification, nor did Boehringer state that ATCC-VR2332 was a 'generic' or 'prototype' virus, nor did Boehringer assert that viruses related to but not identical to the isolated strain were within the scope of the invention. These choices must be held against it."); *see also Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) ("The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history. There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee

disavows the full scope of a claim term either in the specification or during prosecution.") (citations omitted).

Plaintiff has cited *Celltrace LLC v. AT&T Inc.*, which found that whereas "Short Message Service" ("SMS") refers to a particular standard, the lowercase "short message service" is "a generic term for a service that sends short messages."  No. 6:09-CV-294, 2011 WL 738927, at *13 (E.D. Tex. Feb. 23, 2011) (Love, J.).  In that case, however, the Court cited the doctrine of claim differentiation.  *Id.*  Specifically, the patent-at-issue included a dependent claim that recited, in relevant part, "wherein the short message service protocol is an SMS protocol compliant with a GSM cellular telephony standard."  *Id.*, at *12.  *Celltrace* is thus distinguishable.

The remaining issue is whether, as Plaintiff argues, Defendants' proposed construction improperly replaces the word "pass," which appears in the claim, with the phrase "to handle." Claim 7 recites, in relevant part (emphasis added): "invoking an internet server application program interface component to *pass* the extensible markup language document to an integration component."  Because surrounding claim language thus recites that the component at issue is "invoke[ed] . . . to pass the extensible markup language document to an integration component," such a limitation need not, and should not, be included in the construction of the disputed term. The Court therefore rejects Defendants' proposal in that regard.

The Court accordingly hereby construes **"internet server application program interface component"** to mean **"ISAPI component, which is a dynamic link library (DLL) used by Microsoft Internet Information Server (IIS)."**

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patents-in-suit.

The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 2nd day of July, 2015.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE